**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| PATRICIA LEAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-03-1938 |
| | § | |
| | § | |
| METROPOLITAN TRANSIT | § | |
| AUTHORITY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Plaintiff, Patricia Leal, sued her former employer, Metropolitan Transit Authority ("Metro"), alleging national origin discrimination, retaliation, and failure to rehire, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Metro moved for summary judgment as to all claims. (Docket Entry No. 31). Leal has responded, and Metro has replied. (Docket Entry Nos. 42, 45). Based on a careful review of the pleadings; the motion, response, and reply; the summary judgment evidence; and the applicable law, this court grants the motion for summary judgment and, by separate order, enters final judgment. The reasons are set out below.

**I.      Background**

Leal began working for Metro as a part-time bus operator in 1988. In 1989, she became a full-time bus operator. In 1994 Leal worked as a relief bus instructor in Metro's Safety and Training Division. In 1998, Metro promoted Leal to the position of

Transportation Services Coordinator in the Contracted Services and Special Events Division. Leal planned, evaluated, and coordinated Metro services for special events such as professional baseball games and the annual Houston rodeo.  Her duties included contracting with private bus companies, processing bus charters, and assigning bus operators.  Leal worked at Metro's Fallbrook facility and was supervised by James DePitts.

In September 1999, Leal complained internally that DePitts sexually harassed her. DePitts was demoted and transferred to Metro's Kashmere facility.  Leal's workload increased because she had to complete tasks previously performed by DePitts.  Leal alleges that although DePitts had been training her to succeed him, Phillip Brenner, a friend of DePitts, succeeded him as Manager of Contracted Services and Special Events and Leal's new supervisor.  Leal claims that her working conditions continued to deteriorate after Brenner became her supervisor.  She began working longer hours, and because she was a salaried employee, the extra hours were without extra pay.  Leal complains that she was required to be "on call" 24 hours a day and carry a two-way radio, without compensation or compensatory time off.[1]  Leal also had to continue "working around" DePitts from time to time when they attended the same meetings and special events.  Leal states that her new supervisor, Brenner, was "overly critical" of her and "downgraded" her employee evaluation, which prevented her from transferring to another Metro division.  As another example of her

---

[1]

Leal specifically complains that she had to work on her birthday and wedding anniversary.  Her family had to celebrate the occasions by bringing cake to Leal's workplace. (Leal Aff., ¶ 6). Leal also alleges that she was refused time off in order to attend college classes, while another employee, Evelyn Colson, was permitted to take time off and Metro paid for her classes.  (*Id.*, ¶ 7).

poor working conditions, Leal claims that Brenner required her to use her car for Metro business, without compensation. Leal states that before she filed her sexual harassment complaint, she was permitted to use a company car; after Brenner became her supervisor, he used the company car, "forcing" Leal to use her car "without compensation."

In December 2001, Leal filed discrimination and retaliation charges against Metro. On June 24, 2002, Leal sued Metro based on those charges, alleging discrimination based on national origin, race, sex, and retaliation. (Civil Action No. H-02-2369). In Leal's 2002 suit, she made many of the factual allegations that she repeated in this suit—including that DePitts sexually harassed her; that Metro did not allow her to interview for the position that Brenner received; that Metro required Leal to be on-call during nights and weekends without compensation; and that Leal had to work around DePitts. A federal court dismissed Leal's claims on April 30, 2003 as untimely. Leal had not filed her EEOC charge within 300 days of the allegedly discriminatory conduct. (Civil Action No. H-02-2369, Docket Entry No. 21).

In March 2002, Ninfa Muench replaced Brenner as head of the Contracted Services and Special Events Division and Leal's supervisor. Leal had applied for that position. (Docket Entry No. 42, Leal Aff. ¶ 12). In July 2002, Muench conducted Leal's six-month evaluation. Although Muench gave Leal a good review, Leal alleges that Brenner had tried to persuade Muench to give Leal a lower evaluation. (*Id.* ¶ 13). In early August 2002, Leal, Muench, and Muench's supervisor, Karen Green, went to lunch together. At that lunch, they discussed a recent funeral for a coworker's relative that DePitts had attended. According to

3

Leal, "[a]t the lunch, Green staring directly at me said, 'Poor Jim, he has been through so much and is so sensitive.'" (*Id.* ¶ 14).[2]  Leal testified that she did not "think it was proper for her to be talking about him [DePitts] on a personal level in front of me.  I thought that she did it just to hurt me and she did."  (Docket Entry No. 32, att. 3, (Leal Dep. I) p. 53).  Within two weeks, Leal applied for short-term disability leave, citing depression and posttraumatic stress syndrome.

Metro's original short-term disability policy provided Leal, as a salaried employee hired on or after April 1, 1984, a total of six months of paid short-term disability leave.  This included six weeks of short-term disability benefits at full pay and twenty additional weeks at 75 percent of base salary.  (Docket Entry No. 32, att. 5).  The policy in effect at the time Leal went on leave also provided that employees who return to work within ninety calendar days

> will be reinstated in the position held prior to the beginning of the leave period.  If the disability leave of absence exceeds ninety (90) calendar days, reinstatement rights to the same position are not guaranteed.  However, upon receipt of a Release for Return to Work Statement from a licensed attending physician, the Human Resources Department (in cooperation with the appropriate department management) will make every effort to place the employee in a position of similar status, pay and responsibility as soon as one becomes available.

(*Id.*).  Leal did not return to work within ninety days, forfeiting her reinstatement rights to the same position.  Leal learned from a former coworker on November 23, 2002 that Metro

---

[2]  In Leal's deposition, she elaborated, stating that Green said, "I feel sorry for Jim, he was crying like a baby during Jeff Arndt's granddaughter's funeral."  (Docket Entry No. 32, att. 3 (Leal Dep. I), at 53).

had posted Leal's former position for restaffing, which Leal confirmed by checking on-line. Leal received a letter from Metro on December 8, 2002, informing her that the job had been posted.  Leal filed a retaliation charge with the EEOC on December 26, 2002.

Leal exhausted her six months of short-term disability pay.  She did not return to full-time work until late April 2003, after eight months of disability leave.[3]  During Leal's absence, Metro changed its disability policy provision on placement of returning employees. The former policy allowed unlimited time for a employee returning from disability leave to secure another position with Metro.  The new policy, revised April 11, 2003, stated that once an employee receives a Release for Return to Work Statement, Metro "will make every effort to place the employee in a position of similar status, pay and responsibility within 60 days. Should a position not become available with 60 days, the employee will be administratively separated from employment with METRO."  (*Id.*, att. 8).  The change meant that for

---

[3]

Leal stated that she "went out" on leave on August 12, 2002.  Metro submitted a back-to-work letter from the Kelsey-Seabold Clinic dated August 20, 2002, stating that Leal was able to return to work on September 3, 2002.  (Docket Entry No. 32, att. 11).  Leal did not return to work in September 2002. She asserts that she was not medically cleared to return to work until April 17, 2003, at the earliest.  A series of e-mails from Metro's HR department to Leal's supervisor indicates that Leal's physician continually extended Leal's estimated return-to-work date from September 9 to September 12, then September 19, September 26, October 9, October 16, October 24, October 30, November 7, November 21, and December 24, 2002.  (*Id.*, att. 12).  Leal's file contains a leave of absence change form indicating a return-to-work date of February 28, 2003, "pending LTD [long-term disability] approval."  (*Id.*, att. 6).  Leal states that she notified Metro on March 21, 2003 that she could return to work on April 17.  (Leal Aff., ¶ 18).  On April 16, 2003, Leal's counselor sent a letter to Metro's benefits representative, Greg Davy, stating that Leal had been released to "return to work on Thursday, April 17th on a part-time basis, with an increase to full-time work to be anticipated within 2–3 weeks."  (*Id.*, att. 7).  A handwritten note on the letter, signed and dated April 16, 2002, indicates that "per Ms. Leal, she will be ready to work a scheduled 40 hour week beginning April 28, 2003.  I explained to Ms. Leal that she will need to work with T. Osborne in Staffing to secure a position with Metro once she has cleared the RTW [return to work] drug/alcohol screening.  G. Davey 4/16/03."  (Docket Entry No. 32, att. 7).

5

employees whose positions were filled during their disability leave, Metro would no longer

indefinitely seek to place them in other Metro positions when they were eligible to return to

work.  Instead, Metro would terminate their employment if he or she did not obtain a new

Metro position with sixty days returning from disability leave.

Leal sought a new Metro position once she returned from her disability leave.  She

interviewed for a Safety and Training Instructor position on May 21, 2003, but did not get

the job.  (Leal Aff., ¶ 21).  In May 2003, she also applied for the jobs of Electronic

Maintenance General Foreman, Field Supervisor, and Property Services Supervisor.  She did

not receive those jobs.  (*Id*., ¶ 22).  On June 4, 2003, Leal filed this suit against Metro, based

on the charges she had filed in December 2002.  On July 21, 2003, Metro terminated Leal's

employment, citing the new policy requiring returning employees whose jobs had been filled

in their absence to find a new position within sixty days of their return.  Leal alleges that

despite the policy change, Metro allowed three other employees to return to their original

jobs.[4]  Leal also claims that three people in her former department had "picked up my job

duties" in her absence and "could have continued doing that until I returned."  (Leal Aff.,

¶ 24).  Leal stated that in her absence, her supervisor, Muench, had performed Leal's duties

and that no one had been hired to fill her position.[5]  (*Id*.).  After her job termination, Leal

---

[4]

    Those employees, according to Leal, are JoAnn Pettit, Evelyn Cherney, and Glen Martinez.  (Leal
Aff., ¶ 24).

[5]

    Leal also states that another employee, Steve Kane, had been trained to do Leal's job and could have
performed Leal's duties in her absence.  (*Id*.).  Leal's direct supervisor, Ninfa Muench, testified that she
posted Leal's job in November 2002 and hired a replacement in January or February 2003.

continued to seek employment with Metro.  She claims that she applied to be a Field Supervisor and a Staff Specialist in December 2003.  (*Id.*, ¶ 25–26).  When she did not receive a response, Leal called Metro's vice-president of Human Resources, Carolyn Kenner-Varner.  According to Leal, "Kenner-Varner told me, 'Shirley (DeLibero) said as long as you have legal action pending, your applications cannot be considered.'"  DeLibero was then Metro's president.[6]

On March 11, 2004, Leal filed her third EEOC charge, alleging that Metro's new policy requiring employees returning from leave to obtain a new position within sixty days was motivated by retaliation and national origin discrimination against Leal.  (Docket Entry No. 42, att. 7).  The EEOC mailed Leal a right-to-sue letter on June 10, 2004.  (*Id.*, att. 8).  Leal stated that she received the letter by mail, postmarked June 10, 2004, but does not remember the exact date she received it.  "I would expect that it was at least 2–3 days later based on my experience with the U.S. Postal Service in Houston, Texas."  (Leal Aff., ¶ 30).

Metro has moved for summary judgment dismissing all of Leal's claims.  Metro argues that Leal has not made a *prima facie* showing of retaliation stemming from Metro's decision to change its short-term disability policy, which resulted in Leal's job termination;

---

[6]

Although Leal had been deposed twice (on September 9 and November 24, 2004) and filed a third EEOC retaliation and discrimination charge (on March 11, 2004), Leal never mentioned this January 2004 conversation in either deposition or in the latest EEOC charge.  Leal explained in her affidavit that she had mentioned her conversation with Kenner-Varner to her previous lawyer, "but he did not seem interested in it as if it was not important.  Therefore I didn't mention it to my current attorney until after my second deposition."  (*Id.*, ¶ 28).  Leal submitted an affidavit from her friend Jada Thompson, dated March 7, 2005.  Thompson stated that in "late January/early February 2004" Leal repeated the substance of her conversation with Kenner-Varner to Thompson both on the phone and a few days later at dinner.  (Docket Entry No. 42, Thompson Aff.).

that Metro has articulated a legitimate, nonretaliatory reason for terminating Leal's employment; and that there is no disputed fact issue as to whether Metro retaliated or discriminated against Leal in filling the numerous positions she applied for after Metro terminated her employment.  Each of these arguments is addressed below.

## II.    The Applicable Legal Standards

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 37 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the allegations of its pleadings.  *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id*.  The

nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Cabillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322). Conclusory allegations and subjective beliefs, even if in good faith, are insufficient to satisfy the non-moving party's burden on summary judgment. *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 96 (5th Cir. 1991).

## III.    Analysis

Leal claims that Metro retaliated against her for filing a sexual harassment complaint by changing its short-term disability policy, resulting in Leal's termination. Leal also claims that in two instances, Metro retaliated against her by failing to rehire Leal for two positions, Rail Field Supervisor and Staff Specialist.

### A.    What This Court May Consider

Metro has moved to strike parts of Leal's summary judgment evidence. (Docket Entry No. 44).  Metro seeks to strike Leal's affidavit, in whole or in part, as irrelevant, lacking foundation, containing inadmissible hearsay and conclusions, and as inconsistent Leal's prior deposition testimony.  Metro also seeks to strike Jada Thompson's affidavit corroborating Leal's conversation with Kenner-Varner as inadmissible hearsay.

Metro seeks to strike paragraphs one through eleven of Leal's affidavit as irrelevant. These paragraphs concern Leal's sexual harassment allegations against DePitts and allegations that Metro subsequently retaliated against Leal for making those allegations. Metro argues that these portions are irrelevant because they were the subject of Leal's previous lawsuit, which was dismissed.  Leal reasserted those claims in this case.  In an earlier Memorandum and Opinion, this court dismissed those sexual harassment allegations on the basis of claim preclusion.  (Docket Entry No. 16).

Paragraphs one and two and paragraphs four through nine all provide relevant background on Leal's allegations leading to her disability leave, but are not evidence of the alleged retaliation at issue in this suit and are not considered as such.  They are admitted as background information.  The first four sentences of paragraph three all contain inadmissible hearsay and are stricken.  Paragraph ten is also stricken to the extent it states what Karen Green told Leal.

Metro also seeks to strike part of paragraph 13 and all of paragraph 14 as irrelevant and inconsistent with Leal's deposition.  The language at issue contains Leal's description

10

of what Muench told her after Leal's six-month evaluation.  Leal asserts that Muench "told me that Brenner. . . had tried to persuade her to give me a lower rating."  In Muench's deposition, when asked about her evaluation of Leal, Muench testified that no one had changed the rating.  She was not asked if anyone attempted to do so.  (Docket Entry No. 32, att. 4 (Muench Dep.) at 38).  Metro's motion to strike paragraph 13 as irrelevant is denied, although Metro's arguments explain that the testimony deserves little weight.

Paragraph 14 describes Leal's lunch with Muench and Green during which Green brought up DePitts, Leal's former alleged harasser.  The fourth sentence of paragraph 14 contains hearsay in that Leal relates what Green said she observed about DePitts at the funeral.  While this statement is not admissible for the truth of the matter, it is admissible to show the effect it had on Leal, who "cried in the car on the way back to the office."  (Leal Aff., ¶ 14).

Metro seeks to strike the first two sentences of paragraph 16 as hearsay and all of paragraph 19 as inadmissible conclusions.  In paragraph 16, Leal states that she learned from a Metro employee that the opening for the job she had held had been posted.  Because Metro has not disputed that it posted the job opening, and because Leal also states she confirmed the job posting by checking on-line and that she received a letter about the posting.  Metro's motion to strike is denied.  Paragraph 19 purports to describe the timing of Metro's decision to modify its short-term leave policy in relation to Leal's planned return to work.  Leal's statement that Metro knew that she would return to work on April 17, 2003 lacks foundation and is stricken.  As noted, Metro received numerous communications indicating different

11

dates when Leal was expected to return to work.  Leal has provided no basis for her conclusion that Metro was "aware" that she would in fact return on April 17.  The rest of paragraph 19 states that Leal "know[s] this" because two Metro human resources employees told her of the policy change and its effective date.  To the extent Leal is attempting to provide a foundation for her knowledge that Metro changed its policy, it is unnecessary because Leal also states that she received a copy of the changed policy.  Leal's response to the motion to strike states that she is not testifying "about Defendant's motives in changing the policy."  Metro's motion to strike this part of paragraph 19 is denied.

Metro seeks to strike the portions of paragraphs 20 through 22 that relate to Leal's assessment of her own and others' qualifications for Metro positions, arguing that Leal provides only conclusions and self-serving opinions.  Metro also objects to paragraph 24 of Leal's affidavit, arguing that she lacks personal knowledge for her statements regarding three employees who were allegedly permitted to return to their original jobs after disability leave. Metro also objects to paragraph 32, in which Leal states that Metro could or should have trained existing employees to fill in during Leal's absence rather than post her position for restaffing.  Metro's objections go to the weight to be afforded Leal's statements and not their admissibility.  In similar fashion, Metro seeks to exclude Leal's assessment of her own qualifications for Rail Supervisor in paragraph 25.  Because Leal explains the basis for her belief, Metro's motion to strike paragraph 25 is denied.

Metro moves to strike paragraph 27, in which Leal states that a certified mail receipt showed that a Metro representative received her employment application.  Leal argues for

admissibility under Rule 801(d)(2)(A) (admission by party opponent) of the Federal Rules of Evidence.  Leal also argues that certified mail receipts should be admissible under the public records exception of Rule 802(8), or under Rule 807's residual exception.  Leal has not, however, submitted the mail receipt.  Metro objects to Leal's affidavit testimony that she received a receipt signed by Metro.  Metro's objection to Leal's statement as double hearsay is proper and its objection to Leal's testimony about receiving a signed certified mail receipt is granted.

Metro seeks to strike paragraph 28 in which Leal recounts her alleged conversation with Kenner-Varner.  Leal states in her affidavit that Kenner-Varner told Leal that then-Metro president DeLibero had told Kenner-Varner that Metro would not consider Leal's employment applications as long as Leal had lawsuits pending against Metro.  The subject of this alleged conversation arose in a status conference on January 7, 2005.  This court noted it was "troubled" that Leal had been twice deposed and failed to mention this direct evidence of retaliation.  A party cannot defeat a motion for summary judgment by using an "affidavit which impeaches, without explanation, sworn testimony."  *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996).   Leal never mentioned her Kenner-Varner conversation in the depositions she gave after it took place.  Nor did Leal mention it in the latest EEOC complaint, filed after the conversation occurred, despite the fact that Leal alleged retaliation.  Leal claims that she told her previous attorney of the conversation, but he did not pursue it and that she was not questioned about the conversation in her depositions.  (Leal Aff., ¶ 28).

Leal's first deposition—after the alleged conversation with Kenner-Varner—contains

this exchange with Metro's attorney:

Q:   We've talked about retaliation by Mr. Brenner, retaliation by Ms. Adair, retaliation by Mr. Laughlin, retaliation by Ms. Green, retaliation by Jeff Arndt.  Is there anybody else that you believe you were retaliated against?

A:   I listed Shirley DeLibero, and that's because she was in charge at the time and she was familiar with what was going on with me.

Q:   How did Ms. DeLibero retaliate against you?

A:   I felt she retaliated same as Jeff Arndt by allowing it to happen to me.

Q:   When you say "it," are you referring to the long hours, the extra work, that kind of thing?

A:   The retaliation.

Q:   Any other ways in which Ms. DeLibero retaliated against you?

A:   No.  I can't think of any.

Q:   Why would Ms. DeLibero retaliate against you?

A:   Because she was well aware of what was happening and if you're the president and CEO of the company, you should have the best interest of your employees.  And she did not have that.

Q:   Is that your opinion that she did not have the best interest of her employees?

A:   That's the opinion of many co-workers.

Q:   Is that also your opinion?

A:   Yes.

Q:   Did you ever talk to Ms. DeLibero about—

14

A:      No.

Q:      About—You need to let me finish my question.  Did you ever talk to Ms. DeLibero about working long hours, having extra duties, those kinds of things?

A:      No.

Q:      Did she ever communicate with you regarding anything that was particular to your employment with Metro?

A:      No.

Q:      Okay.  Other than Ms. DeLibero, anybody else who retaliated against you?

A:      I can't think of anyone right now.

(Leal Dep. I, at 55–57).  Leal's deposition makes it clear that the only ways in which she felt DeLibero retaliated against her was by not having "the best interest of your employees." Leal specifically stated that she alleged DeLibero retaliated against her because DeLibero "was in charge," "familiar with what was going on with me," and "allow[ed] it to happen to me."  Leal never mentioned the Kenner-Varner and DeLibero conversation.  Even when directly asked to identify any other way in which DeLibero retaliated against her, Leal never mentioned the alleged Kenner-Varner conversation.

In a later deposition, Leal had apparently still not revealed this conversation to Metro or her new attorney.  When counsel for Metro questioned Leal on how Kenner-Varner retaliated against her, Leal still did not mention the conversation referencing DeLibero.  (Leal

15

Dep. II, at 13, 21–23).[7]

Leal's affidavit contradicts her sworn testimony.  Leal does not explain the contradiction.  *See Copeland v. Wasserstein, Perella & Co., Inc.*, 278 F.3d 472, 482 (5th Cir. 2002) (stating that "under the federal rules, when the sole evidence purporting to create a genuine issue of material fact and thus to preclude summary judgment is an affidavit that conflicts with deposition testimony, we have required an explanation of that conflict.").  Nor does the Thompson affidavit, which purports to verify the content of Leal's conversation with Kenner-Varner, explain the contradiction.  Metro's motion to strike Thompson's affidavit and the portions of Leal's affidavit discussing her alleged conversation with Kenner-Varner is granted.

## B.      Retaliatory Discharge

A retaliation claim requires a *prima facie* showing that: (1) the employee engaged in

---

[7]

Leal's deposition testimony about Kenner-Varner does not resolve the contradictions created by her affidavit:

| | |
|---|---|
| Q: | What is it that Ms. Kenner-Varner did that you believe was retaliation against you with respect to the Rail Supervisor position? |
| A: | Failure to hire me. |
| Q: | Other than that, was there anything else that Ms. Kenner-Varner did that leads you to believe that she retaliated against you in selecting the Rail Supervisor position? |
| A: | I don't know. |
| Q: | Do you remember the year? |
| A: | No. |
| Q: | Okay.  Do you know when you applied for the Staffing Representative position? |
| A: | No. |
| Q: | Do you remember that year at all? |
| A: | No. |
| Q: | I don't have any other questions. |

(Leal Dep. II, at 22–23).

protected activity under Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action. *Thomas v. Tex. Dep't Crim. J.*, 220 F. 3d 389, 394 (5th Cir. 2000); *Mattern v. Eastman Kodak*, 104 F.3d 702, 705 (5th Cir. 1997). An employee has engaged in activity protected by Title VII if she has either (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. *Long v. Eastfield College*, 88 F.3d 300, 304 n.4 (5th Cir. 1996). The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 1824–25, 36 L. Ed. 2d 668 (1973), applies to Title VII retaliation cases. *Long*, 88 F.3d at 304–05. Once the plaintiff makes a *prima facie* showing, the burden of production shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Id.* If the defendant produces evidence that, if true, would permit a trier of fact to conclude that the adverse employment action was nondiscriminatory, the focus shifts to whether the defendant unlawfully retaliated against the plaintiff. *Id.* at 305. "The ultimate question in an unlawful retaliation case is whether the defendant discriminated against that plaintiff because she engaged in conduct protected by Title VII." *Id.* at 304; *Thomas*, 220 F.3d at 394.

Leal argues that she engaged in protected conduct when she reported DePitts's harassment in 1999, filed sexual harassment and retaliation charges with the EEOC in 2001, filed a lawsuit based on those charges in 2002, and filed this lawsuit in 2003. Metro does not dispute that Leal engaged in protected conduct. Leal asserts that she suffered an adverse

employment action when "she was not allowed to return to work after her disability leave, resulting in her termination on July 21, 2003." (Docket Entry No. 42, p. 12).[8] Metro argues that Leal's *prima facie* case fails because she cannot show a causal connection between the protected activity and the adverse employment action, and that Leal cannot refute Metro's legitimate, nonretaliatory reason for her termination.

### 1.    *Causal connection*

To satisfy the third *prima facie* element, a causal connection between the adverse employment action and the protected activity, Leal points to her alleged conversation with Kenner-Varner in which Leal asserts that Kenner-Varner relayed a statement from Metro's president to refuse to consider hiring Leal as long as she had legal action pending.[9] As noted, this court excluded consideration of this alleged conversation—as described in Leal's affidavit—because Leal's deposition contradicted the later affidavits and failed to explain the contradiction.

---

[8]

The adverse employment action is Leal's job termination. Metro asserts that it terminated Leal's employment because of her failure to secure a new position within sixty days of returning from disability leave. Leal acknowledges that only ultimate employment actions are actionable in a retaliation claim under the Fifth Circuit's decision in *Mattern v. Eastman Kodak Co.*, 104 F.3d 702 (5th Cir. 1997), but argues that "*Mattern* imposes a standard that is at odds with almost every other federal circuit." Leal argues this court should consider Metro's institution of the sixty-day limit policy to be the relevant adverse employment action. Regardless of whether this court considers the policy change or the termination as the relevant adverse action, Metro has offered a nondiscriminatory justification for both, and Leal has not raised a fact issue as to a causal connection between either action and her protected activity.

[9]

Leal recognizes that this conversation, if admitted, would constitute direct evidence of retaliation. (Docket Entry No. 42, p. 13). Leal nonetheless seeks to use this conversation to satisfy her *prima facie* burden, which arises only in the absence of direct evidence and is satisfied by the plaintiff producing circumstantial evidence. *See Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001).

Leal argues that she has presented the following additional circumstantial evidence of retaliation: (1) Metro required Leal to work unreasonably long hours; (2) Metro changed Leal's job duties; (3) Metro downgraded her performance in an evaluation; (4) a Metro supervisor "yelled at Leal"; (5) Metro did not hire Leal for the position of Safety and Training Instructor;[10] and (6) that the timing of Leal's termination evidences retaliatory intent because Leal filed EEOC charges on December 26, 2002, was denied employment in May 2003, and terminated in July 2003.

None of Leal's circumstantial evidence connects any adverse employment action with Leal's protected activity.  Leal's protected activity consists of her 1999 sexual harassment complaint; her 2001 and 2002 EEOC charges; her dismissed 2002 lawsuit, and this lawsuit. Leal alleges that her job hours increased and duties changed after her 1999 sexual harassment complaint.  Although Leal blames Brenner, her then-manager, for her increased workload and duties, she acknowledges that her department's workload "grew tremendously" at the time with the addition of Metro services for new sponsored events, including "84 Astros games." (Leal Dep. I, at 15–16).  The Special Events department had only four employees when Leal's workload increased,[11] and Brenner's job required that he travel frequently.  (*Id.*

---

[10]

Leal applied for the position in May 2003 while still employed by, but not working for, Metro.  The Safety and Training position is not a basis for Leal's post-termination failure to rehire retaliation claims, which are addressed below.  Those positions are for Rail Field Supervisor and Staffing Supervisor.

[11]

Manager Philip Brenner supervised Leal, the Transportation Services Coordinator.  The department also included Contract Compliance Analyst Sylvia Garza, and Service Supervisor Ray Martinez.  (Leal Dep. I, at 15).

at 16).  Although Leal asserts that Metro increased her workload to retaliate against her for

filing the 1999 sexual harassment complaint, she has provided no evidence of an unlawful

motive on the part of Metro or Brenner.

Leal claims that after she complained in 1999, she received an unjustified lower

performance evaluation that could hinder an attempt to transfer departments.  The undisputed

evidence is that Brenner gave her good evaluations.[12]  *See Scrivner v. Socorro Indep. Sch.*

*Dist.*, 169 F.3d 969, 972 (5th Cir. 1999) ("[C]onclusory allegations, unsubstantiated

assertions, and subjective beliefs" of retaliation will not defeat summary judgment).

Moreover, under Fifth Circuit authority, a declining performance evaluation does not

constitute an adverse employment action under Title VII.  *See Banks v. Baton Rouge Parish*

*Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003); *Mattern*, 104 F.3d at 707–08 (stating that

declining evaluations are not adverse employment actions).  In any event, Leal has provided

---

[12]

Leal testified in her deposition: "I am convinced [Brenner] gave me a lower evaluation than what I deserved.  And I can honestly say I deserved it.  When you live in that office and you neglect your small child and your husband and your other children and a grandchild to do a job, you should be evaluated as such." (Leal Dep. I, at 16).  The evaluation has not been submitted as summary judgment evidence.  At her first deposition, Leal testified that Brenner unfairly evaluated her when he wrote on her 2000 evaluation, "The goal for next year would be for Patty to increase communication on projects."  Leal testified, "I disagree with it because he's making it sound like maybe I was not making an effort to communicate with him, when I was always available.  He's the one that was not."  (Leal Dep. I, at 29).  While Leal views this as a criticism, Brenner rated Leal's performance in the area of communication as "completely satisfied minus."  Leal's overall rating for this performance evaluation was "completely satisfied."  Leal agreed with that assessment. (*Id.* at 30).  In a later evaluation, Leal disagreed with Brenner's assessment that her "interaction with private contractors is professional but, at times, she needs to set boundaries."  (*Id.* at 32).  Leal attributed this comment to her telling Brenner "that one particular gentleman was very flirtatious with me."  Leal disagreed with the evaluation because "I did set boundaries."  (*Id.* at 33).  Leal testified that Brenner had scored this evaluation as "satisfies most," a step below "completely satisfied."  Leal complained, and Brenner changed it to "completely satisfied."  Then Leal "went upstairs and talked to Barbara [Adair] and Barbara changed it back to "satisfies most."  Leal testified that she did not know why Adair changed it.  (*Id.* at 37).

no evidence that Brenner had any involvement in the 2003 decision to change Metro's short-term leave policy or, for that matter, to terminate Leal's employment.  *See Media v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) ("A 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.").  Brenner no longer supervised Leal at the time Metro terminated her employment.

Leal also argues in her response to Metro's summary judgment motion that a departmental supervisor yelled at her and that this is additional circumstantial evidence of retaliation.  The incident in question occurred after Leal complained to Brenner about a group of bus drivers called the "Factotum Council."  Leal stated that when Brenner did not take any action after she complained to him, she sent an e-mail "about an incident that occurred" with the Factotum Council to Barbara Adair.  Adair was Metro's Transportation Director and Brenner's superior.  Leal testified, "Barbara was very angry at me for bringing attention to the Factotum so she yelled at me.  And from then on that caused Phillip to give me those evaluations because he was angry at the problems that my addressing that issue had caused him as well." (Leal Dep. I, at 17).[13]  Leal did not identify any other "retaliatory" actions by

---

[13]

Leal returned to the topic later in her deposition.  When asked how Adair retaliated against her, Leal responded:

> Well, when I addressed the issues of the Factotum on that e-mail that I sent her, she called my office and she yelled at me, like, really ugly, that why had I written that e-mail like that.  And I told her that, that was about the three incidents that occurred and I felt it was necessary to tell my boss and his boss, which was Barbara Adair.  So the yelling incident is, I am viewing it as retaliation because I don't think a boss should yell at an employee when they are doing what they're supposed to do, or at any time, for that matter.

Adair.  (*Id.* at 51).  This testimony is inconsistent with her testimony that Brenner retaliated against her for filing the sexual harassment complaint against DePitts.  Leal now attributes her declining evaluations to Brenner and Adair's anger over Leal's Factotum e-mail, and not to retaliation for Leal's sexual harassment complaint.  Regardless, reprimands do not constitute adverse employment actions for a retaliation cause of action.  *See Green v. Adm'r of Tulane Educ. Fund*, 284 F.3d 642, 657–58 (5th Cir. 2002) (disciplinary actions do not constitute ultimate employment actions); *Mattern*, 104 F.3d at 707–08 (reprimands, verbal termination threats, coworker hostility, and resulting anxiety are not ultimate employment actions); *Webb*, 139 F.3d at 540 (rude treatment by employer is not an ultimate employment decision).  Leal has not provided any evidence connecting Adair to Metro's changed short-term disability leave policy, or to Leal's job termination, both of which occurred years later.

Leal argues that Metro retaliated against her by not hiring her for open positions as a Safety and Training Instructor.  Leal applied for those positions in May 2003.  By that time, Metro had already changed its short-term disability policy and required Leal to find a new position with sixty days of returning from leave or face termination.  Leal interviewed for this position on May 21, 2003.  She had previously worked as a relief Safety and Training Instructor from 1994 until her 1998 promotion to Transportation Services Coordinator.  Metro selected Robert Dent, Juan Garza, and Joyce Davis-Williams, and did not hire Leal.

---

(Leal Dep. I, at 46–47).  Asked again why Adair retaliated against her, Leal replied, "For standing up for the truth . . . [a]bout the Factotum, about my evaluation, about my long hours."  (*Id.* at 47–48).  It is not clear how this incident is connected to Leal's 1999 complaint, 2001 or 2002 charges, or either lawsuit.  Those protected activities all allege discrimination based on sex, national origin, and retaliation.

Leal argues that she was more qualified than these three individuals based on the fact she had performed this job in a relief capacity for four years and "was a job grade level above those who were given the job." In her deposition, Leal also asserted that she was more qualified.

Metro produced competent evidence that it selected better-qualified candidates in picking Dent, Garza and Davis-Williams for these positions. Dent, Garza, and Davis-Williams each had twice as much experience as Leal as a relief Safety and Training Instructor. (Docket Entry No. 32, att. 13 (Aff. of R.C. Patterson), ¶ 2–3); atts. A–B, E (employment applications)). In addition, all three had been performing that job continuously until Metro hired them as full-time instructors in 2003. In contrast, Leal served only as a relief instructor from 1994 to 1998, and had not been in that position for five years. Leal's reasons for viewing herself as better qualified are entirely conclusory. When asked why she was more qualified than Dent, Leal replied, "I am a better instructor." Asked how she knew she was a better instructor, Leal said, "I know that. People have told me that and I know that." Leal asserted that her record demonstrated that her trainees did not need "refresher" training and that some time before 1998, when she had assumed her new office position, her Safety and Training supervisor had told that she was a good instructor. Metro's decision to choose candidates with much more recent and relevant experience is not evidence of retaliation. Leal could not identify any other way in which Metro retaliated against her in hiring Dent instead of her for the vacant training position. (Leal Dep. II, at 14–16). *See Grimes v. Tex. Dep't of Mental Health and Retardation*, 102 F.3d 137, 139 (5th Cir. 1996) ("Needless to say, unsubstantiated assertions are not competent summary judgment

23

evidence.").

Leal interviewed before the same three-person interview panel as the winning candidates.  The panel members were Albert Griffin, Rudolph Becerra, and Thomas Osborne.[14]  (Docket Entry No. 42 (Ans. to Interrog. No. 4)).  The panel interviewed and ranked thirteen candidates.  It scored Dent, Garza, and Davis-Williams first, second, and fourth, respectively, and Metro hired all three.[15]  Leal ranked ninth.  (*Id.*, att. 13-C). Patterson testified that he made the hiring decisions and did not consult with any alleged retaliators when he made these decisions.  (*Id.*, ¶ 5).  In short, Metro has provided abundant evidence that it did not retaliate in its Safety and Training hiring decisions, and Leal has produced no evidence except vague and conclusory allegations.[16]

---

[14]

Although Leal has asserted that numerous Metro employees discriminated or retaliated against her (DeLibero, Arndt, Adair, Laughlin, Green, Brenner, Muench, and Talbot), none of these individuals served on the Safety and Training evaluation panel.  In one deposition, Leal asserts that "[p]ossibly Thomas Osborne" retaliated against her, but did not identify what Osborne did to retaliate against Leal, other than not hire her.  (Leal Dep. II at 21).  In her first deposition, Leal said she believed the interview panel prejudged her.  When counsel asked Leal for her basis for this belief, she replied, "Just the lack of eye contact" when Leal walked into the interview room.  (Leal Dep. I at 81–82).

[15]

Walter Stavinoha ranked third.  Metro hired him in a second round of hiring for Safety and Training Instructor.  (Docket Entry No. 32, att. 13-C).

[16]

Leal asserts that Metro's failure to hire her as a Safety and Training Instructor is evidence of retaliation, and not retaliation in itself.  Regardless, Metro also argues that Leal lacks sufficient evidence that Metro either retaliated or discriminated against Leal by refusing to hire her for this vacancy.  (Docket Entry No. 31, p. 16–17).  Leal responds that she "does not rely only on her relative qualifications but has produced direct evidence and additional indirect evidence of a pretext and retaliation."  (Docket Entry No. 42, p. 16). To the extent Leal has stated a claim for retaliation or discrimination based on Metro's refusal to select her for a Safety and Training position, Metro is entitled to summary judgment on that claim.  Leal's allegations that Brenner, Green, or Adair retaliated against her are without any evidentiary support.  As noted, Metro has provided uncontradicted evidence that Metro chose candidates more qualified than Leal for the Safety and Training vacancies.

24

Finally, Leal argues that the temporal proximity between Leal's December 2002 EEOC charges and her job termination in July 2003 provides additional circumstantial evidence of retaliation.  Leal's argument ignores the lengthy history of her employment and the basis and timing of Metro's short-term disability policy change.  Leal filed her first harassment complaint, against DePitts, in 1999.  Leal remained in her position and received at least one positive evaluation after that complaint—her 2002 evaluation by her new supervisor, Muench.  Muench testified that even by the end of 2003, after Metro had posted Leal's position, Muench was willing to have Leal return to her job.  This is despite the fact Leal had been on disability leave for over three months and given Muench no indication of when or if she would return.  Leal in fact would not be available to return to work for another five months.  In essence, Leal argues that Metro waited four years to retaliate against her for filing her 1999 sexual harassment complaint, and then did so by changing a policy affecting *all* employees in order to keep her from a job.  Leal's argument also ignores the fact that Metro changed its short-term disability policy in April 2003.  Leal was on notice at that point that she would be administratively separated if she did not find a new position within sixty days.  Leal has provided no summary judgment evidence that Metro terminated her for filing this lawsuit, rather than for failing to comply with a policy put in place months earlier.  Leal has not submitted competent summary judgment evidence to create a genuine issue of material fact to connect Leal's protected activity and the adverse employment action.  Without such a causal connection, Leal's *prima facie* case fails and makes summary judgment appropriate on her retaliation claims.

2.     *Legitimate nonretaliatory justification*

Even assuming that Leal could show a causal connection between her protected conduct and Metro's adverse employment action, Metro has also offered a legitimate, nonretaliatory reason for its decision to change its short-term leave policy and its decision to terminate Leal's employment.  Metro claims that, consistent with its policies, it delayed posting Leal's position for hire until November 2002, after Leal had been on short-term disability for ninety days.  Metro then filled that vacancy in early 2003.  When Leal's physician released her to work in April 2003, her previous job was no longer available because Metro had hired someone to fill the vacancy.  Metro terminated Leal on July 21, 2003 because she failed to secure another Metro position within sixty days of returning from disability leave, a policy change Metro had instituted on April 11, 2003.  Although Leal testified that she believed Metro instituted this change to retaliate against her, she also testified that she does not know who made the change or why they made it.  (Leal Dep. I at 71, 142).

According to Metro Human Resource Director Charles Bartulla, Metro changed its policy and required employees returning from disability leave to secure a new position within sixty days to address nondiscriminatory business concerns.  (Docket Entry No. 32, att. 9). When a physician released an employee on disability to return to work, many employees did not or could not make employee contributions to medical and dental insurance coverages because they had no income.  (*Id*., ¶2).  Metro then assumed payment of insurance premiums indefinitely, paying both the employee's and employer's shares.  According to Bartulla,

26

"Very often, these employees were unable to locate a vacant position with Metro after months of looking, and eventually left the Authority's employment without reimbursing Metro for the employee contributions that the Authority made on their behalf during the period when they received no income." (*Id.*).  Additionally, Metro changed the services it provides after light rail service began in Houston in 2003.  Metro's vacancies were in technical positions requiring rail experience, experience not frequently found in Metro's existing workforce of bus drivers.  (*Id.*, ¶ 3).[17]

Bartulla also explained the process that led to Metro's new policy.  He stated that in early 2003, Human Resources vice-president Kenner-Varner

> directed me and other directors in the department to review Metro's policy on short-term disability.  Accordingly, I reviewed the policy along with directors Jocelyn Wright, Gwen Fedrick and Robert Reilly.  We determined that the policy should be revised with respect to the time period given to employees, whose jobs had been filled during their short-term disability leaves of absence, to obtain a vacant position.

(*Id.*, ¶ 2).  Bartulla explained the problem of Metro assuming the employees' portion of insurance payments and the shifting nature of Metro's current and predicted future job vacancies from bus to rail.  (*Id.*, ¶¶ 2–3).  Bartulla testified that "[b]ased on this information, the above-named directors, including myself, recommended that the period of time during which an employee whose job was filled during his leave be limited to sixty days.  No one other than the above-named directors were involved in the revision of the policy." (*Id.*, ¶ 3).

---

[17]

Leal herself was a fifteen-year veteran bus driver and bus charter supervisor.  One of the positions she applied for on her return from disability was for Rail Field Supervisor.

Bartulla also addressed Leal's charge that Metro had changed its policy to retaliate against her. "During the consideration of this policy revision, there was no discussion of the impact of the policy change on any particular employee. Moreover, the policy change was applied to all employees who were on short-term leave disability as of the effective date, as well as to those who took short-term disability after the effective date. I was not involved with Ms. Leal's return to work in April, 2003, following her leave of absence." (*Id.*, ¶¶ 4–5). Leal has not provided any evidence to controvert this explanation of the 2003 policy change or Metro's description of the individuals involved in that decision. Leal has not disputed that Metro has applied this policy to all individuals who return from disability leave after their previous position had been filled in their absence.

Leal's summary judgment response argues that Metro's purported justification for its new policy is false and that this falsity is evidence of an illegal retaliatory motive. Leal asserts that Metro did not apply its new policy to three employees who had taken short-term disability and were permitted to return to their original jobs after the new policy's effective date: JoAnn Pettit, Evelyn Cherney, and Glen Martinez. (Leal Aff., ¶ 24). Leal could not testify as to when these employees took disability leave and when they returned from that leave. This court is unable to find evidence—on the basis of Leal's testimony alone—that the new policy did or did not apply to these other employees. Nor did Leal testify as to whether or when Metro posted their jobs in the interim and filled the vacancies, or if Metro filled their positions with temporary relief workers. If Metro did not accept applications for, and fill, these vacancies, then the sixty-day requirement to find a new position would not

28

apply to these employees.  Other than Leal's unsupported assertions that three employees were permitted to return to their previous jobs, Leal has provided no evidence that Metro selectively applied its short-term leave policy.

Metro filed an affidavit from Adair, the senior director of transportation responsible for filling vacancies in Transportation Superintendent and Assistant Superintendent positions. (Docket Entry No. 32, att. 14).  Adair explained that Pettit was an assistant transportation superintendent who took disability leave in April 2002 and returned in August 2003. According to Adair, Pettit's position was not posted because Metro maintains a relief pool of trainees who can fill that particular position during regular employees' vacations and absences.  (*Id.*, ¶ 3).  Leal's position as transportation services coordinator, by contrast, "was a 'one-of-a-kind' position.  There was only one such position at the Authority, and there was no pool of employees who could perform that job in Ms. Leal's absence."  (*Id.*, ¶ 4).  Leal's direct supervisor confirmed this in her deposition.  (Docket Entry No. 32, att. 4).  Muench testified that she had originally anticipated that Leal would return sooner, around September 23.  In late November, after Leal had been on short-term leave for ninety days, Muench decided to post Leal's position.  Muench testified that she alone made this decision. According to Muench, her department was "about two or three months away from the year's biggest event," the Houston Rodeo and Livestock Show.  "A lot of work has to be done in preparation.  Holidays are coming up, and I was never given an indication that Patricia would or would not come back, and I was getting to the point that the job was beginning to suffer

as a result of her absence." (*Id.* at 33–34).[18]  While the clerical aspects of Leal's position could be completed with temporary help, "this temporary was not going to work because this temporary could not do what Ms. Leal did." (*Id.* at 43).  Muench testified that had Leal returned in the fall of 2002, Muench would have hired her back.  By November 2002, however, Muench had not heard from Leal for two months.[19]  (*Id.* at 44, 48–49).

Cherney was the second employee who Leal asserts was permitted to return to work despite the new policy.  Adair testified that Cherney worked in another Metro program called "M.E.A.D." that was a part of bus maintenance.  Cherney's supervisor, Melvin Price, "made the decision not to post Ms. Cherney's job during her short-term disability leave of absence." (*Id.*, ¶ 5).  In her earlier deposition, Leal testified only that Cherney left on disability before Leal left Metro, and that her position was not posted.  Leal did not know when Cherney returned or if Metro filled her position in her absence.  Leal testified that Cherney passed away a few months before Leal's September 2004 deposition.  As noted, whether Metro posts a position held by an absent employee says nothing about whether Metro selectively applies its sixty-day limit on finding a new position.  Leal has not provided evidence of a Metro policy requiring supervisors to post vacant positions.  Rather, supervisors may seek

---

18

  Muench testified that "I was getting into a time crunch, and I was already running behind on the planning of this major event, and I was panicking about the fact that I had no one trained in that position. And I couldn't—I had been carrying both duties or both positions, and I knew that—and I had already begun some of the work, but I saw the road ahead of me and knew that I was headed into trouble if I didn't do something." (Muench Dep. at 42).

19

  Muench's notes and Metro e-mail indicate that around this time, Leal's husband came to her office and cleaned out most of Leal's belongings, and said he would return for the rest.  (Muench Dep. at 32).

replacement employees once an employee has been on disability over ninety days.  Neither Metro nor Leal has provided information on Glen Martinez, the third employee mentioned in Leal's affidavit.  Leal does not mention Glen Martinez in her depositions.  The record provides no support for Leal's argument that Metro selectively applied the policy at issue. No genuine issue of material fact as to retaliation is present.  Metro's motion for summary judgment on Leal's retaliation claim is granted.

### C. Failure to Rehire

Leal asserts that Metro retaliated against her by refusing to hire her for two positions she applied for in 2003, after being terminated.  Leal's initial complaint in this suit did not claim retaliation by failing to rehire.  Leal filed another EEOC charge alleging that she "made several attempts to apply for several posted positions, but to no avail.  I interviewed for safety and training instructor, but a black employee got the position."  Leal checked boxes on the charge indicating she alleged discrimination based on retaliation and national origin. The EEOC sent Leal a right-to-sue letter on June 10, 2004.  This court permitted Leal to amend her complaint to add a retaliatory failure to rehire claim and permitted Metro to redepose Leal.  In her second deposition, Leal stated that she had applied for the positions of Rail Field Supervisor and Staffing Representative "and several others that just can't recall."  (Leal Dep. II, at 18).  Leal did not know who Metro hired for those positions or their qualifications.  Regarding the Rail Supervisor position, Leal alleged that she had been retaliated against by Human Resources vice-president Kenner-Varner and employees Portia Talbot and "[p]ossibly Thomas Osborne."  (*Id.* at 21).  Leal stated that Talbot refused to

31

assist her in obtaining a new Metro position by failing to return her phone calls and her "[f]ailure to select me." (*Id*.).  When asked how Kenner-Varner retaliated against Leal in selecting a Rail Supervisor, Leal replied, "[f]ailure to hire me."  Leal could not identify any specifics other than the failure to rehire as evidence of retaliation.  Leal did not know what year she applied for the job.[20]  Counsel for Metro attempted to question Leal regarding the Staffing Representative position, but Leal could provide no information.  (*Id*. at 23).

Leal argues that she need only raise an issue of a causal connection between her protected activity and Metro's failure to hire her for these two positions to establish a *prima facie* case of retaliation.[21]  As direct evidence, Leal again points to the alleged statement made by DeLibero in the disputed conversation with Kenner-Varner, which is not competent summary judgment evidence.

### 1.   *The Rail Supervisor Position*

Leal testified in her affidavit that she applied for a Rail Field Supervisor position around December 3, 2003, but Metro did not hire her.[22]  This court permitted Leal to take

---

[20]

Job applications that Leal submitted in response to summary judgment indicates Leal applied for field supervisor positions on May 2, 2003 and on December 3, 2003.  The former position is clearly a rail supervisory position based on the minimum requirements of that position.  (Docket Entry No. 42, atts. 4–5).

[21]

Metro has also moved for summary judgment on Leal's national origin discrimination claims.  Leal has not responded, stating, "Plaintiff cannot respond with regard to her national origin discrimination claims because she has only been permitted to do written discovery on those claims and her motion to allow full discovery on those claims was denied." (Docket Entry No. 42, p. 1).  Metro's motion for summary judgment on Leal's national origin discrimination claims is granted.

[22]

Some confusion exists as to when Leal applied to what position.  Leal stated that during her deposition she misstated the year she applied for Field Supervisor as 2002.  Leal applied for a another Rail

additional written discovery on the failure to hire claims.  (Docket Entry Nos. 39–40).  In

answering interrogatories about Metro's specific reason for hiring each Rail Field Supervisor,

Metro stated that "the successful candidates were better qualified."[23]  Leal argues that this

response "fails to meet its burden to articulate a 'clear and reasonably specific' legitimate

non-retaliatory reason for not hiring Leal," citing *Patrick v. Ridge,* 394 F.3d 311 (5th Cir.

2004).  Leal asserts that "[e]ven if Leal had not presented direct evidence of retaliation,

Metro's failure to articulate a reasonably specific reason for not hiring Leal would  relieve

Leal or [sic] demonstrating anything other than a *prima facie* case."  (Docket Entry No. 42,

p. 19).  At this stage, Leal has not demonstrated a *prima facie* case of discriminatory

retaliation because she has not shown any causal connection between Leal's protected

activity and Metro's adverse employment action.  Leal cannot point to Metro's nonspecific

assertion of a legitimate, nondiscriminatory reason for not hiring Leal as evidence of a causal

connection to meet Leal's initial burden.  To do so would reverse the order and allocation of

burdens between plaintiff and defendant.  *See Patrick*, 394 F.3d at 317–18. (stating that *after*

an employee makes a *prima facie* case of retaliation, an employer cannot satisfy its burden

to show a legitimate, nondiscriminatory reason for its decision by asserting nonspecific

---

Field Supervisor in May 2003.  (Docket Entry No. 42, att. 3).

[23]

    Leal had asked Metro to "detail the circumstances and the specific reason for Defendant's hiring the
person(s) identified in Interrogatory No. 2 for the rail supervisor position instead of Plaintiff, stating the
factual basis for your answer.  (Note: Plaintiff is seeking Defendant's allegedly legitimate nondiscriminatory/
non-retaliatory reason, if any, for failure to hired [sic] plaintiff to the Positions."  Metro objected on grounds
of vagueness and ambiguity.  Rather than respond specifically for each of the 14 Rail Field Supervisors it had
hired, Metro answered, "[T]he successful candidates were better qualified."  (Docket Entry No. 42, Interrog.
Ans. No. 3).

justifications, such as an employee was not "sufficiently suited" or others "were better qualified"). Leal offers no other basis for a causal connection between her protected activity and Metro's failure to hire her as a rail supervisor. She cannot make a *prima facie* case. Metro is entitled to summary judgment on Leal's claim of retaliatory failure to hire for Metro's decisions to fill its Rail Supervisor positions.

### 2.     The Staff Specialist Position

Similarly, Leal's only evidence of a causal connection between her protected activity and Metro's failure to hire her for a Staff Specialist position is contained in one of Metro's interrogatory responses. Metro again responded to Leal's interrogatory about its hiring for this position by asserting that it hired a better-qualified candidate. Leal argues that this nonspecific justification does not satisfy Metro's burden of demonstrating a legitimate nonretaliatory reason for its decision. (Docket Entry No. 42, p. 19). Leal has not made a *prima facie* showing of retaliation based on Metro's failure to hire Leal for the Staff Specialist position. Metro attached to its reply additional evidence to show that it has a legitimate, nonretaliatory reason for its decision to hire individuals other than Leal for these two positions. Metro's evidence documents the successful candidates' extensive qualifications for their positions. Leal has moved to strike the reply, arguing that evidentiary attachments must be attached to the original summary judgment motion, citing *Burciaga v. West*, 996 F. Supp. 628, 639 (W.D. Tex. 1998), *aff'd*, 162 F.3d 94 (5th Cir. 1998) (table case). (Docket Entry No. 46). *Burciaga*, to the extent it provides the controlling law, states that "[w]hether the Court considers such filings is purely discretionary." 996 F. Supp. at 639.

34

Metro submitted this evidence in response to Leal's argument that Metro had not offered a specific nondiscriminatory reason for its hiring decisions.  The summary judgment evidence presented by both parties in the motion and response sufficiently shows the absence of a genuine issue of material fact on this issue.  Leal's motion to strike is denied.  Metro has articulated a legitimate nondiscriminatory reason for its hiring decisions.  For example, the individual hired as Staff Specialist, a recruiting position, has several years of experience in recruiting, which Leal lacked.  (Docket Entry No. 45, atts. E–F).  The Rail Field Supervisor had several years of experience operating and supervising trains in the Dallas light rail system. (*Id.*, atts. B–D).  Leal had no rail experience.  Leal cannot meet either the first or last burdens necessary to preclude summary judgment.

## IV.   Conclusion

Metro's motion for summary judgment is granted.  Final judgment is entered by separate order.

SIGNED on May 26, 2005, at Houston, Texas.

Lee H. Rosenthal
United States District Judge